IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BESANG, INC.,                                    No. 3:23-cv-00113-HZ

               Plaintiff,                OPINION & ORDER

    v.

INTEL CORPORATION,

               Defendant.

Susan D. Pitchford
Chernoff Vilhauer LLP
111 SW Columbia St, Ste 725
Portland, OR 97201

Aisha Mahmood Haley
Bjorn A. Blomquist
Bradley Wayne Caldwell
James F. Smith
Jason Dodd Cassady
John Austin Curry
John Franklin Summers
Richard A. Cochrane
Robert Seth Reich, Jr.
Warren Joseph McCarty III
Xu Zhou

Caldwell Cassady Curry PC
2121 N Pearl St, Ste 1200
Dallas, TX 75201

     Attorneys for Plaintiff

Chad S. Campbell
Tyler Reese Bowen
Elizabeth Baxter
Heather C. Martin
Perkins Coie LLP
2901 N Central Ave, Ste 2000
Phoenix, AZ 85012

Renee E. Rothauge
Sarah J. Crooks
Gregory J. Mina
Perkins Coie LLP
1120 NW Couch St, 10th Floor
Portland, OR 97209

Christina McCullough
Dorianne Salmon
Perkins Coie LLP
1201 Third Ave, Ste 4800
Seattle, WA 98101

Philip Alcide Morin
Perkins Coie LLP
11452 El Camino Real, Ste 300
San Diego, CA 92130

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Plaintiff BeSang Inc. moves to disqualify Perkins Coie LLP from representing Defendant

Intel Corporation in this patent infringement suit. For the following reasons, the Court denies the

motion.

**BACKGROUND**

On January 23, 2023, Plaintiff sued Defendant, alleging infringement of its patent No. 7,378,702 ("the '702 Patent"), entitled "Vertical Memory Device Structures." Compl. ¶ 9, ECF 1. On February 14, 2023, attorney Gregory Mina from Perkins Coie appeared on behalf of Defendant, moving for an extension of time to answer the Complaint. ECF 24. After the Court granted the motion, Defendant answered the Complaint on April 3, 2023. ECF 40. The Court held a Rule 16 telephone conference on May 16, 2023. ECF 45. Discovery is ongoing. *See* McCarty Decl. Exs. N (Defendant's First Set of Interrogatories), O (Defendant's First Set of Requests for Production).

On June 13, 2023, counsel for Plaintiff emailed counsel for Defendant regarding a potential conflict of interest. McCarty Decl. Ex. K. Counsel for Plaintiff wrote, "Yesterday we became aware that Perkins Coie has worked with Plaintiff BeSang Inc. as a prospective client on numerous occasions, as recently as December 2021." *Id.* Counsel added that "BeSang shared information to and met with Perkins attorneys about BeSang's patent portfolio, strategies for enforcing the asserted '702 Patent, and licensing BeSang's IP." *Id.* Counsel for Plaintiff advised that they expected to file a motion to disqualify if counsel for Defendant did not withdraw voluntarily. *Id.* General counsel for Perkins Coie responded that the firm would not agree to withdraw from the case. *Id.* Counsel for Plaintiff filed the present motion on June 26, 2023. ECF 60. The parties' briefs and supporting exhibits were submitted to the Court *in camera*.

Plaintiff's Motion for Disqualification relies on three prior transactions between Plaintiff and Perkins Coie. First, in 2009, Dr. Sang-Yun Lee, Plaintiff's CEO, worked with Perkins Coie attorneys Neil Nathanson and Jeffrey Bock on a potential contract with a manufacturer. Pl. Br. 2. Second, in 2020, Lee met with Nathanson about a potential IP licensing deal and venture capital

fundraising. *Id.* at 3. Third, in 2021, Lee met with Perkins Coie attorney Chun Ng about a potential patent infringement case against a different company. *Id.* at 4.

## STANDARDS

The district court is authorized to supervise the conduct of members of its bar. *Gas-A-Tron of Arizona v. Union Oil Co. of California*, 534 F.2d 1322, 1324 (9th Cir. 1976). The court "may disqualify an attorney for not only acting improperly but also for failing to avoid the appearance of impropriety." *Id.* at 1324-25 (quoting *Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382, 1385-86 (3d Cir. 1972)). "The competing interests involved in a conflict of interest case require the court to strike a delicate balance that prevents unreasonable restrictions on an attorney's ability to practice law while nonetheless upholding the system's integrity[.]" *Brooks v. Caswell*, No. 3:14-CV-1232-AC, 2015 WL 1137416, at *4 (D. Or. Mar. 12, 2015). If the motion for disqualification is based on a conflict of interest, "any doubts must be resolved in favor of disqualification." *Smith v. Cole*, No. CV 05-372-AS, 2006 WL 1207966, at *2 (D. Or. Mar. 2, 2006), *report and recommendation adopted*, No. 05-CV-372-AS, 2006 WL 1280906 (D. Or. Apr. 28, 2006). "Because of the potential for tactical use of disqualification, however, courts have established a 'high standard of proof' for the party moving to disqualify substitute counsel." *Evraz Inc., N.A. v. Cont'l Ins. Co.*, No. 3:08-CV-00447-AC, 2013 WL 6174839, at *2 (D. Or. Nov. 21, 2013) (quoting *Smith*, 2006 WL 1207966, at *2).

Federal courts "apply state law in determining matters of disqualification." *In re Cnty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000). The Oregon Supreme Court determines the ethical standards that govern attorneys in Oregon. *Jimenez v. Rivermark Cmty. Credit Union*, No. 3:15-CV-00128-BR, 2015 WL 2239669, at *2 (D. Or. May 12, 2015). *See also* LR 83-7(a)

(requiring all attorneys admitted to practice in this District to "[b]e familiar and comply with the Oregon Rules of Professional Conduct").

## DISCUSSION

Plaintiff argues that Perkins Coie must be disqualified from representing Defendant because the firm's three prior transactions with Plaintiff create a conflict of interest with no informed consent or adequate screen to permit the firm's continued representation of Defendant. The parties agree that Plaintiff is a former client with respect to the 2009 transaction, and a prospective client with respect to the 2020 and 2021 transactions. The Court concludes that none of the three transactions justifies disqualification of Perkins Coie.

## I.    Delay in Filing

Defendant argues that Plaintiff unreasonably delayed in bringing the Motion for Disqualification, indicating that it is tactically motivated. Def. Resp. 2-3, 9-10. Defendant states, "Intel's invalidity contentions were soon due, and other key strategic deadlines were approaching in just weeks" when Plaintiff raised the issue of a conflict of interest in mid-June 2023. *Id.* at 3. Defendant also points out that Plaintiff's CEO, Lee, had met with Perkins Coie attorneys three times, suggesting it is implausible that Plaintiff's counsel would not have learned of the potential conflict sooner. *Id.* at 9. Plaintiff argues that Lee "is an inventor and a businessman, not a lawyer," whereas Perkins Coie was aware of the meetings from the start of the case. Pl. Br. 22.

"[A] former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right." *Tr. Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983). In determining whether the right is waived, the district court should consider the timing of the former client's objection and of the filing of the motion to disqualify, as well as

the proximity to trial. *Id.* at 88 (holding that former client waived right to object to conflict of interest where it waited two years and six months before objecting to the representation or filing a motion to disqualify and most of the trial preparation had been completed).

The Court concludes that the four-month delay between Perkins Coie's appearance in this case and the date Plaintiff's counsel first raised the potential conflict does not warrant denying Plaintiff's motion. Even if Plaintiff knew or should have known of the conflict in February 2023, the delay in filing until June 2023 was not unreasonably long. *See Merch. Techs., Inc. v. Telefonix, Inc.*, No. 05-CV-1195-BR, 2006 WL 8459001, at \*3 (D. Or. Aug. 7, 2006) (holding that delay of eight months between first notice of intent to seek disqualification and filing of motion to disqualify was not unreasonable). This case is still in the early stages of discovery, and Plaintiff promptly filed its motion after notifying Defendant of the potential conflict and attempting to negotiate a resolution. The Court therefore turns to the merits of the motion.

## II.    The 2009 Representation

### A.    Oregon Rule of Professional Conduct 1.9

Oregon Rule of Professional Conduct ("RPC") 1.9 governs conflicts with former clients.

The Rule provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless each affected client gives informed consent, confirmed in writing.

RPC 1.9(a). The Rule also states:

> For purposes of this rule, matters are "substantially related" if (1) the lawyer's representation of the current client will injure or damage the former client in connection with the same transaction or legal dispute in which the lawyer previously represented the former client; or (2) there is a substantial risk that confidential factual information as would normally have been obtained in the prior representation of the former client would materially advance the current client's position in the subsequent matter.

RPC 1.9(d).

Under Oregon law, an attorney-client relationship may be formed by express agreement, though an express agreement is not necessary. *In re Conduct of Weidner*, 310 Or. 757, 768 n.7, 801 P.2d 828 (1990). A client's reasonable expectation that an attorney-client relationship has been formed may also suffice. *Id.* at 770.

    B.     Analysis

        i.     Formation of Attorney-Client Relationship

The parties agree that Plaintiff and Perkins Coie formed an attorney-client relationship in the 2009 matter. On April 10, 2009, Lee emailed Robert Aldisert at Perkins Coie, stating that Plaintiff needed counsel to review a contract with a customer, Seagate Technology. McCarty Decl. Ex. A. Lee then corresponded with attorney Neil Nathanson at Perkins Coie, who asked for "a brief description of the proposed transaction," stated, "I may ask an attorney from our licensing and technology group to join us," and proposed a meeting on April 17, 2009. *Id.* Ex. B. Lee agreed to the proposed meeting date and explained that the proposed transaction was a collaboration agreement, not a license agreement. *Id.* Nathanson advised that attorney Jeffrey Bock would be present. *Id.* On April 17, 2009, Nathanson's secretary sent Lee an engagement letter. *Id.* Ex. C. On April 19, 2009, Lee responded that he had signed and mailed the engagement letter. Livingston Decl. Ex. 7.

On April 22, 2009, Lee emailed Nathanson and Bock that the proposed deal with Seagate had fallen through. McCarty Decl. Ex. D; Livingston Decl. Ex. 9. Nathanson responded, asking if he should "take over the option plan records and administration function." Livingston Decl. Ex. 11. Lee responded that his company did not currently have enough funds. *Id.* Ex. 12. On May 29, 2009, Nathanson emailed Lee with a breakdown of billing for work performed,

primarily by Bock, which included outlining a supply agreement and drafting a design tool license and wafer supply agreement. *Id.* Ex. 14. Lee responded to the email, stating that at the time of the meeting, "BeSang's direction of negotiation with Seagate was not clear because there was no feedback from Seagate," and he "thought there was no work request from BeSang to" Nathanson and Bock yet. *Id.* Ex. 15 at 1. Nathanson replied that although the firm believed the work was authorized, "as a good will gesture, we will write down the full amount that would have been due." *Id.* Ex. 16 at 1. In response to this email, Lee wrote, "I wonder what kind of work did you do. Did you ask me the direction? How did you start the work without business direction from you client? Did I give you the direction? I expected some discussion about the direction of agreement with Seagate on the following week of Tuesday from our meeting. However, I received notice from Seagate." *Id.* Ex. 17 at 1.

The emails between Lee and attorneys at Perkins Coie show that an attorney-client relationship was formed. Perkins Coie sent Lee an engagement letter and performed legal work for which it billed Plaintiff. Plaintiff is a former client of Perkins Coie, so Perkins Coie cannot represent parties in substantially related matters who have interests materially adverse to Plaintiff's unless both parties give informed consent confirmed in writing. RPC 1.9. Most of these requirements can be quickly resolved. There is no evidence that Plaintiff provided informed consent to Perkins Coie's representation of Defendant. Plaintiff asserts that it was never asked to and did not waive future conflicts. Pl. Br. 3. Defendant does not dispute this. And there is no dispute that Defendant's interests are materially adverse to Plaintiff's in the present case. The Court therefore turns to whether the 2009 representation is "substantially related" to the current litigation.

ii.    Substantially Related Matter

In arguing that the 2009 representation is substantially related to the current litigation, Plaintiff focuses on the second of two ways to show such a relationship. Pl. Br. 8. Two matters are substantially related if "there is a substantial risk that confidential factual information as would normally have been obtained in the prior representation of the former client would materially advance the current client's position in the subsequent matter." RPC 1.9(d). Under this definition, "actual possession of client confidences is not necessary." *In re Hostetter*, 348 Or. 574, 591, 238 P.3d 13 (2010) (applying ABA Model Rule with the same wording as relevant portion of RPC 1.9).

Plaintiff asserts that the 2009 matter and the current litigation are substantially related because in 2009 it would have provided information about its technology and business outlook that would be directly relevant to the current litigation. Pl. Br. 11. The '702 Patent had already been issued. *Id.* at 10. Plaintiff states that it would have discussed its technology with Perkins Coie, and this information could help Defendant with "claim scope, claim construction, infringement, invalidity, and damages." *Id.* at 11. Plaintiff also states that it likely would have discussed its financial position with Perkins Coie, which it contends is relevant to damages and invalidity. *Id.* at 11-12. Although Plaintiff submitted a declaration from Lee with its motion, the declaration does not address the 2009 matter. *See generally* Lee Decl.

Defendant counters that the matters are not substantially related. Def. Resp. 12-17. According to Defendant, Nathanson and Bock had a one-hour meeting with Lee and got no further than starting to draft a design tool and wafer supply agreement between Plaintiff and Seagate Technology, LLC. Def. Resp. 13; Livingston Decl. ¶ 6, Ex. 1 (draft agreement). Both Nathanson and Bock state that the representation did not concern any patent. Nathanson Decl. ¶

11; Bock Decl. ¶ 10. According to Defendant, "a generalized discussion of technology of the kind needed to understand the subject-matter of the collaboration, would not have required any confidential technical information." Def. Resp. 15 (citing Bock Decl. ¶¶ 5, 8). Nathanson and Bock both state that to the best of their knowledge, they did not discuss Plaintiff's technology in detail with Lee. Nathanson Decl. ¶¶ 7, 9; Bock Decl. ¶¶ 5, 8-9. Defendant also points to videos and written publications that share information about Plaintiff's technology, asserting that Plaintiff's technology "is also not secret." Def. Resp. 15 (citing Tietz Decl. ¶¶ 5-6).

Addressing Plaintiff's argument about business information, Defendant first points out that the meeting occurred fourteen years ago, in 2009, and that Plaintiff alleges that Defendant's infringement began in 2016. Def. Resp. 16 (citing Compl. ¶ 26). Plaintiff alleges infringement "since at least 2016." Compl. ¶ 26. Defendant argues that even if business information from 2009 is relevant to damages, it would not be materially harmful due to the complexity of the royalty inquiry. Def. Resp. 16. And it argues that Plaintiff fails to show how general business information would materially advance Defendant's position on invalidity. *Id.* at 17.

The emails between and among Lee, Nathanson, and Bock support Defendant's account of the meeting. In assessing whether there is a substantial risk that Perkins Coie would obtain confidential information that would materially advance Defendant's position in this litigation, the Court will consider the extent of representation actually provided. *See Trone v. Smith*, 621 F.2d 994, 1000 (9th Cir. 1980) (holding that a one-month investigation into the viability of a proposed business deal was sufficient to create a conflict, but noting that if the representation "had been aborted before any significant work had been done in the stock offering and before any discussions with the client other than the bare preliminaries of the representation were explored, we might now have a different case"). Here there was a single meeting of approximately one

hour, and Perkins Coie prepared a rough draft of a proposed agreement between Plaintiff and Seagate based only on that meeting. Livingston Decl. Ex. 1.

The record shows that the meeting was a high-level preliminary meeting. The risk that detailed information would be shared at such an early stage of the representation is not substantial. The record supports Bock and Nathanson's assertions that they did not acquire detailed information about Plaintiff's technology or other confidential information. *See* Bock Decl. ¶¶ 5, 8-9; Nathanson Decl. ¶¶ 7, 9-10. The draft agreement is largely boilerplate, with blanks where information needed to be filled in. *See generally* Livingston Decl. Ex. 1. It shows that Bock and Nathanson knew that Plaintiff "ha[d] developed proprietary single-chip, three-dimensional . . . integrated circuit . . . technologies, processes for making such circuits and related intellectual property." *Id.* at 1. It shows that Bock knew that Plaintiff "has also developed proprietary design tools for use in designing masks that may be applied to wafers[.]" *Id.* Finally, it shows that Bock knew that the proposed deal was for Seagate to purchase four lots of wafers from Plaintiff. *Id.* There is no description of any of those technologies, processes, or tools. *See generally id.* Nor is there any evidence that Lee shared pricing information with Bock and Nathanson, as the price components of the draft agreement are blank. *Id.* at 4, 12. Consistent with this, Lee's emails to Nathanson and Bock expressed surprise that any work had been done, as the nature of the deal was still unclear, and Lee had not provided the information he believed to be necessary for work to begin. Livingston Decl. Ex. 15 at 1, Ex. 17 at 1.

The limited information Bock and Nathanson learned from Lee would not materially advance Defendant's position in this litigation. Some of it is not even confidential. Plaintiff's patents for integrated circuit technologies are matters of public record. And Defendant's position in this patent infringement litigation is not materially advanced by the bare knowledge that in

2009, Plaintiff sought to enter into a deal with a manufacturer of wafer masks. That matter is quite different from the current patent infringement litigation. Had the representation proceeded, there might indeed have been a substantial risk that the information Plaintiff outlines in its motion would be shared and would materially advance Defendant's position in this litigation. *See Trone*, 621 F.2d at 1000. But where the record shows only a high-level preliminary conversation, the risk that Perkins Coie obtained such information is not substantial, and the extreme step of disqualification of counsel is not warranted.

To illustrate, another court in this district granted the plaintiff's motion to disqualify counsel for the defendant in a patent infringement case where counsel had jointly represented the plaintiff and the defendant in a different patent infringement case several years before. *Merch. Techs. Inc.*, 2006 WL 8459001, at *1. As part of the representation, counsel "studied [plaintiff's] fabrication processes, examined [plaintiff's] confidential financial records, obtained detailed technical information about [plaintiff's] products and how they are made, and spent 'considerable time' interviewing [plaintiff's] Chief Executive Officer and other key [plaintiff] personnel." *Id.* The court concluded that counsel "obtained some degree of confidential information about how the product at issue works, about [plaintiff's] financial information, and about [plaintiff's] business processes." *Id.* at *4. The court also concluded that "an objective view of the record shows there is a risk that confidential factual information" counsel learned during the prior representation could be used to advance defendant's position in the current litigation. *Id.*

In *Merchandising Technologies*, the prior representation was extensive in scope and more closely related to the later representation. Here, in contrast, the record shows that Perkins Coie had one one-hour meeting with Lee and performed about eight hours of preliminary work based

only on that meeting before Lee informed Nathanson and Bock that the deal had fallen through.

The record also shows that Nathanson and Bock learned very little about the matter, to the point

that Lee did not even see how Bock could have begun working. There is not a substantial risk

that information that would normally be obtained after a one-hour preliminary meeting about a

collaboration agreement with a manufacturer for a design tool would materially advance

Defendant's position in this patent infringement case fourteen years later. The 2009 matter is not

substantially related to the current litigation and is not a basis to disqualify Perkins Coie. The

Court now turns to the 2020 and 2021 meetings.

### III.    The 2020 and 2021 Meetings

#### A.    Oregon Rule of Professional Conduct 1.18

Plaintiff asserts that it was a prospective client with respect to its 2020 and 2021

transactions with Perkins Coie. Pl. Br. 16. The relevant RPC provides: "A person who consults

with a lawyer about the possibility of forming a client-lawyer relationship with respect to a

matter is a prospective client." RPC 1.18(a). "Even when no client-lawyer relationship ensues, a

lawyer who has learned information from a prospective client shall not use or reveal that

information, except as Rule 1.9 would permit with respect to information of a former client."

RPC 1.18(b).

> A lawyer subject to paragraph (b) shall not represent a client with interests
> materially adverse to those of a prospective client in the same or a substantially
> related matter if the lawyer received information from the prospective client that
> could be significantly harmful to that person in the matter, except as provided in
> paragraph (d). If a lawyer is disqualified from representation under this paragraph,
> no lawyer in a firm with which that lawyer is associated may knowingly undertake
> or continue representation in such a matter, except as provided in paragraph (d).

RPC 1.18(c). The Rule does not define "substantially related" or "significantly harmful," and

Oregon courts have not interpreted the Rule. As an assistant general counsel for the Oregon State

Bar observed, "[o]ther jurisdictions have looked to their equivalent former client conflict rules in

considering whether a matter was 'substantially related' under their equivalent versions

of RPC 1.18." Sarra Yamin, *Understand the Duties That Arise from Consultations Meeting*

*Prospective Clients*, Or. St. B. Bull., Nov. 2020, at 12-13. And in determining whether

information is significantly harmful, "other states have considered whether the information is

publicly available; would likely be disclosed in discovery; relates to motives, strategies or

weaknesses; or has the potential to impact settlement proposals." *Id.* at 13.

Similar to Rule 1.9, Rule 1.18 provides that the representation may continue if the lawyer

obtains informed consent, confirmed in writing, from the affected client and the prospective

client. RPC 1.18(d)(1). Unlike Rule 1.9, Rule 1.18 provides another way to allow the

representation to proceed. The representation is permissible if

> [T]he lawyer who received the information took reasonable measures to avoid
> exposure to more disqualifying information than was reasonably necessary to
> determine whether to represent the prospective client; and
> > (i) the disqualified lawyer is timely screened from any participation in the
> > matter; and
> > (ii) written notice is promptly given to the prospective client[.]

RPC 1.18(d)(2).

B.    Analysis

i.    The 2020 Meeting

The parties agree that Plaintiff was a prospective client with respect to the 2020 meeting.

Pl. Br. 16; Def. Resp. 18. On January 8, 2020, Lee emailed Nathanson about "an important

business opportunity in China and investors who are about to make $1M through convertible

note," and requested a meeting to review documents. McCarty Decl. Ex. F. Nathanson

responded, asking for the names and addresses of the investors to run a conflict check. *Id.* Lee

and Nathanson scheduled a meeting for January 9. *Id.* Lee states that he emailed Nathanson to

discuss "a pending intellectual property ('IP') licensing deal with a Chinese memory product manufacturer" and "was also seeking legal advice regarding BeSang's Korean venture capital ("VC") investors in connection with the deal." Lee Decl. ¶ 1. Lee states that at this meeting, he told Nathanson about Plaintiff's technology and developments in its technology and IP licensing. *Id.* ¶ 2. He also told Nathanson about the structure of the proposed IP license and how it compared to the company's prior licenses. *Id.* He also described efforts to raise venture capital and the terms of the proposed fundraising. *Id.* Lee states that Nathanson advised him on these matters. *Id.* ¶ 3. Lee also states that he was not asked to waive any future conflicts of interest on behalf of himself or Plaintiff. *Id.* ¶ 4. Plaintiff subsequently decided to hire a different firm. *Id.* ¶ 5.

Defendant disputes Lee's characterization of the meeting. Def. Resp. 18-20. Defendant asserts that Lee's declaration "is completely conclusory: nothing but generalized speculation" and "plain wrong" about the subject of the meeting. *Id.* at 18. In particular, Defendant states that Nathanson did not advise Lee about the terms of an IP license because Nathanson is not a patent attorney or a licensing attorney. *Id.* at 19. Nathanson explains that his "practice focuses on advising startup companies in venture, angel, and other private and public equity and debt financings, mergers and acquisitions, securities law, and corporate governance." Nathanson Decl. ¶ 2. He adds, "While I have some experience with patents and licenses, I do not draft license agreements or litigate disputes involving patents or licenses." *Id.*

According to Nathanson, "The meeting was about potential representation in connection with a potential minority convertible-note financing transaction expected to raise approximately $1 million from angel investors from South Korea." *Id.* ¶ 14. Nathanson states that Lee did not seek advice about a pending IP licensing deal. *Id.* ¶ 15. He states that "[i]f a client or prospective

client indicates that they anticipate needing such advice, I involve an attorney at the Firm whose practice does include patent licensing at the client meeting and afterward." *Id.* ¶ 16. He states that had he needed another attorney present, he would have emailed that attorney, and after reviewing his emails he found no such email. *Id.*

Nathanson explains that had the representation gone forward, he would have created a disclosure schedule that "would have required [Perkins Coie] to become familiar with BeSang's patents and other intellectual property" but that "such work would not have been pursued in any meaningful way in the short, initial meeting." *Id.* ¶ 17. Nathanson states that he "did not receive information about BeSang's technology or patents, aside from generalized information about the type of technology (three-dimensional memory chips) and possibly the fact that patents existed." *Id.* ¶ 18. He states that to his knowledge, Plaintiff did not supply any written materials for the meeting. *Id.* ¶ 19. He did not receive further communication from Lee after the meeting. *Id.* ¶ 21.

The Court concludes that Nathanson's version of the meeting is more plausible given other evidence available. Lee's email to Nathanson mentions a possible deal with investors through a "convertible note," mentions documents related to that investment, and does not indicate that Lee sought advice on an IP license. McCarty Decl. Ex. F; Nathanson Decl. Ex. 1. The Court accepts Nathanson's statement that his practice does not include drafting license agreements or patent litigation and that he does not advise on such topics. And the Court accepts Nathanson's statement that detailed information about Plaintiff's technology was not shared in a preliminary meeting. Thus, the questions are (1) whether the 2020 meeting is substantially related to the current litigation, and (2) whether the information Nathanson did receive could be significantly harmful to Plaintiff in the current litigation.

Because the answer to the second question is "No," the Court need not address the first. The high-level preliminary information Nathanson received during the meeting, relating to a potential investment deal, would not be significantly harmful to Plaintiff in this litigation. Plaintiff alleges that "Intel could use its knowledge of these possible investments to drive its discovery strategy and ultimately support its damages arguments." Pl. Br. 17. Plaintiff relies on *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1305 (Fed. Cir. 2015). In *Carnegie Mellon*, the Federal Circuit concluded that although past practices in licensing agreements are generally relevant in calculating damages, the plaintiff's licensing agreements with third-party investors for the patent at issue did not dictate the result in the case because the investors were not similarly situated to the defendant microchip manufacturer. *Id.* at 1304-05. *Carnegie Mellon* indicates that any information Nathanson obtained is unlikely to be significantly harmful here. Plaintiff does not assert that the 2020 meeting concerned the '702 patent. And angel investors from South Korea are not similarly situated to Defendant. It is not significantly harmful to Plaintiff if Defendant knows that Plaintiff sought an investment from Korean investors in 2020.

Furthermore, public information put Defendant on notice that Plaintiff was seeking such investments. Defendant points out that Plaintiff stated on its own website during that time that it was raising funds through convertible notes. Tietz Decl. ¶ 15, Exs. 14-15 (versions of Plaintiff's website from November 24, 2019, and January 23, 2020). It is also a matter of public knowledge that Plaintiff received funding from Korean investors, as one of those investors sued Plaintiff for repayment of promissory notes in this District in 2013. *Id.* ¶ 17, Ex. 18. The public information available points against potential harm because Defendant was on notice that the information existed and thus could be sought through discovery. The information Nathanson obtained did not

pertain to settlement positions or litigation strategy, which Defendant likely could not obtain during the course of this litigation. The limited preliminary information Lee shared at the 2020 meeting would not be significantly harmful to Plaintiff in this litigation. Thus, the 2020 meeting is not disqualifying.

                ii.      The 2021 Meeting

The parties agree that Plaintiff was a prospective client with respect to the 2021 meeting. Pl. Br. 16; Def. Resp. 23. Plaintiff asserts that the 2021 meeting involved the same patent infringement issues as the current litigation but against a different potential defendant. Pl. Br. 14. Defendant does not contest this and does not argue that the matters are not substantially related. Rather, Defendant argues that no Perkins Coie attorney received information that could be significantly harmful to Plaintiff in this matter. Def. Resp. 23.

On December 6, 2021, Lee emailed attorney Chun Ng at Perkins Coie to ask if he was "comfortable with 3D NAND patent infringement case." McCarty Decl. Ex. G. Ng responded, "As you may know, we represent companies such as Intel and Micron, and as such, we would be unable to represent your company in anything adverse to those two companies." *Id.* He wrote, "I am more than happy to give some general legal advice at no charge, but if we were to get into specific details, I would have to 'clear conflicts of interest' here at the firm before we could represent BeSang." *Id.* Lee asked if there was a conflict with YMTC. *Id.* Ng responded, "We don't represent YMTC, nor are we adverse to BeSang." *Id.* He continued: "In that case, we would be clear to have a preliminary conversation with you." *Id.* Lee and Ng agreed to a meeting date. *Id.* Lee then sent Ng a slide deck with a summary of the case and comparison of memory structures for Plaintiff and YMTC. *Id. See also* Ex. H (slide deck).

Ng explains that he did a "quick check" with Perkins Coie's Professional Standards Department before setting up the meeting. Ng Decl. ¶ 7. After learning that the firm did not represent YMTC and was not then adverse to Plaintiff, Ng told Lee he could have a half-hour conversation. *Id.* Ng states that he did not request any written materials, but Plaintiff sent him an email with an eight-page slide deck, and a second email with a ten-page slide deck. *Id.* ¶ 8. The ten-page version was identical to the eight-page version except that it had two more pages. *Id.* According to Ng, the slide deck contains no information that could be significantly harmful to Plaintiff in the current litigation or information that could be considered highly confidential information pertaining to Plaintiff. *Id.* ¶ 9. Ng further states that he did not discuss technical details with Lee. *Id.* ¶ 13. Ng explains that "[t]he purpose of the preliminary call with Dr. Lee was to gather sufficient high-level information to determine whether I believed Perkins Coie should pursue an engagement with BeSang with regard to its potential dispute with YMTC." *Id.* ¶ 14. He did not discuss the slide deck with Lee. *Id.* Ng declined representation early in the conversation because many of the patents were about to expire and YMTC had no sales in the United States. *Id.* ¶ 19. He had no further contact with Lee. *Id.* ¶ 21.

The Court accepts Ng's description of the call because it is consistent with his correspondence with Lee and other evidence in the record. Although Plaintiff's brief emphasizes the importance of the 2021 meeting, Lee's declaration says nothing about it. Instead, Plaintiff relies on the slide deck Lee sent to Ng. Pl. Br. 4. Plaintiff states that it "contained substantial technical detail covering sensitive BeSang information." *Id.* In Ng's estimation, however, the slide deck contains no highly sensitive information about Plaintiff and nothing that could be significantly harmful to Defendant in this litigation. Ng Decl. ¶ 9.

After reviewing the slide deck, the Court concludes that it contains no information that could be significantly harmful to Plaintiff in this litigation. Most of the content in the slide deck is either general information about Plaintiff and its patents, which is publicly available or otherwise discoverable, or information relating to YMTC, which is of little to no relevance here. Some slides depict diagrams of memory cells that do not indicate to which company they pertain. To the extent that Plaintiff argues that potential claim mapping or structural comparisons of memory cells for Plaintiff and YMTC would be significantly harmful to it, the Court disagrees. YMTC is not a defendant here. And Plaintiff's Complaint includes detailed allegations and diagrams describing how Defendant infringes the '702 Patent, and more such information will be disclosed in required disclosures or discovery. Finally, although one of the slides is titled "BeSang's Strategy," it provides only information about YMTC and another Chinese company, and is not germane to this litigation. *See* Ng Decl. Ex. 2 at 9. The slide deck does not contain any indicators of strategy or confidential information about Plaintiff that could be significantly harmful to it in this litigation. Without more, it is not significantly harmful to Plaintiff if Defendant knows that Plaintiff considered suing YMTC for infringing the '702 patent. Because Perkins Coie did not obtain information that could be significantly harmful to Plaintiff in this litigation, the 2021 meeting is not disqualifying.

Finally, the Court considers the effect of Perkins Coie's precautionary screen with respect to the 2021 meeting. Although the Court has already concluded that Perkins Coie did not violate RPC 1.18, the screening mechanisms employed reinforce the conclusion that disqualification is not justified here. First, Ng took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent Plaintiff. When Lee first contacted Ng, Ng advised Lee that Perkins Coie represented Intel. Ng Decl. Ex. 1 at 2.

Lee asked about YMTC. *Id.* Ng submitted a "quick check" request to Perkins Coie's Professional Standards Department. Ng Decl. ¶ 7. This is a standard procedure at the firm. Thomas Decl. ¶ 4. After learning that the firm did not represent YMTC and was not currently adverse to Plaintiff, Ng responded to Lee, "we would be clear to have a preliminary conversation." Ng Decl. ¶ 7 (quoting Ex. 1 at 2). Prior to the meeting, Lee sent the slide deck to Ng. *Id.* ¶ 8. Ng did not ask for written materials. *Id.* Nor is there any evidence that he told Lee not to provide written materials or confidential information. *See* Pl. Br. 21.

The Court concludes that Perkins Coie took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary. Ng communicated to Lee that the meeting would only be preliminary. He was not required to tell Lee not to provide him any confidential information. Such a warning might further reduce the risk of exposure to disqualifying information, but it could also hamper a lawyer's ability to determine whether to represent a prospective client. Ng states that he "did not share the Slide Deck or put written materials related to the meeting on a Firm document management system, and I kept BeSang's information private as a prospective client." Ng Decl. ¶ 18. The firm's professional standards compliance counsel states that the slide deck cannot be found in the firm's document management system. Livingston Decl. ¶ 5. Ng did forward the slide deck to another attorney, Ryan McBrayer, in February 2023 as part of the firm's conflicts analysis. Ng Decl. ¶ 23. He also forwarded it to attorney Anthony Marks. *Id.*

Second, Ng and other lawyers who received information related to the meeting were timely screened from any participation in this case. On February 3, 2023, the firm screened Ng, as well as two other attorneys, from this matter. Thomas Decl. ¶ 8, Ex. 1. One of the other screened attorneys, Stephen Bishop, was screened because Ng forwarded Lee's initial email to

him to ask if it was a legitimate inquiry. Bishop Decl. ¶ 3. The other, McBrayer, was screened

because Bishop and Ng communicated with him about the potential representation around the

time of the meeting and again during the conflicts analysis. McBrayer Decl. ¶¶ 3-4, 5; Bishop

Decl. ¶ 4; Ng Decl. ¶ 23.

The screen provided that the three attorneys would not "participate in the potential

representation of Intel" or discuss any information about Plaintiff "that could be potentially

related" to the current litigation. Thomas Decl. Ex. 1. It instructed lawyers working on the case

not to solicit any information from those three attorneys. *Id.* The screen was comprehensive and

was set up before Perkins Coie appeared on behalf of Defendant. The screen was communicated

firmwide on February 23, 2023. Thomas Decl. Ex. 2. Ng, Bishop, and McBrayer all state that

they have abided by the screen. Ng Decl. ¶ 26; Bishop Decl. ¶ 9; McBrayer Decl. ¶ 8. After the

screen was implemented, Anthony Marks, an attorney at Perkins Coie who is the lead for the

firm's relationship with Defendant, spoke with attorney Chad Campbell, who was to lead the

litigation team in the current matter, to ensure that he had read and understood the screen. Marks

Decl. ¶¶ 2, 4. Marks directed Campbell not to discuss the firm's prior contacts with Plaintiff. *Id.*

¶ 4. Attorneys from the Perkins Coie team representing Defendant in this litigation state that they

have not obtained any information about Plaintiff from attorneys at the firm who previously

worked with Plaintiff or from the firm's document management system. Campbell Decl. ¶¶ 3-4;

Bowen Decl. ¶¶ 3-4; Baxter Decl. ¶¶ 3-4; Martin Decl. ¶¶ 3-4; Rothauge Decl. ¶¶ 3-4; Mina

Decl. ¶¶ 3-4; McCullough Decl. ¶¶ 3-4; Salmon Decl. ¶¶ 3-4; Morin Decl. ¶¶ 3-4.

Third, Perkins Coie did not give Plaintiff written notice of the screen until Plaintiff's

counsel raised the potential conflict in June 2023. Tietz Decl. Ex. 13 at 1. According to

Defendant, notice was prompt because it was sent within a reasonable time after Plaintiff raised

the issue. Def. Resp. 34. Defendant also argues that it had no obligation to notify Plaintiff because the Rule did not require a screen in this case. *Id.* In Plaintiff's view, the screen is insufficient because notice was not prompt. Pl. Br. 20.[1] The record shows that the potential for a conflict of interest was apparent to Perkins Coie from the outset of its representation of Defendant. Perkins Coie instituted the screen in February 2023 but did not notify Plaintiff of it until June 2023. Defendant has not convinced the Court that notice was prompt. But Defendant is correct that notice was not required because RPC 1.18 did not require a screen here. And the screen otherwise complies with RPC 1.18, which further supports the conclusion that disqualification is not warranted. The Court has no reason to believe that any confidential information relating to Plaintiff obtained through the meeting has reached or will reach the Perkins Coie litigation team in this case. In sum, Plaintiff has not met the high standard of proof required to show that Perkins Coie should be disqualified based on a conflict of interest.

## CONCLUSION

Plaintiff's Motion for Disqualification of Counsel [60] is DENIED.

IT IS SO ORDERED.


DATED: ___August 25, 2023___.



MARCO A. HERNÁNDEZ
United States District Judge

---

[1] Plaintiff also argues that the screen is inadequate because it does not apply to the petition for *inter partes* review Defendant filed or other litigation involving the '702 patent in which Perkins Coie may be involved. Pl. Br. 21. That issue has not been fully briefed by the parties, and the Court is not convinced that it would be appropriate to disqualify counsel here because of potential ethical conflicts in separate litigation before a different tribunal.